UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DANNY S. MCCORMICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:11-CV-00328 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Danny McCormick appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

In November 2006, McCormick filed an application for DIB, alleging disability from

January 20, 2001.  (Tr. 16, 130-32, 144.)  His claim was denied initially and upon

reconsideration, and McCormick requested an administrative hearing.  (Tr. 16, 84-87, 90-92.)

Administrative Law Judge ("ALJ") Bryan J. Bernstein conducted a hearing on June 11, 2009, at

which McCormick, who was represented by counsel; McCormick's wife; and a vocational expert

("VE") testified.  (Tr. 16, 30-81.)  At the hearing, McCormick, at the advice of counsel, amended

his alleged onset date to July 13, 2003.  (Tr. 16, 35.)

_____

[1]All parties have consented to the Magistrate Judge.  (Docket # 11); *see* 28 U.S.C. § 636(c).

1

On December 7, 2009, the ALJ rendered an unfavorable decision to McCormick, concluding that he was not disabled through December 31, 2006, his date last insured, because he could have performed a significant number of jobs in the national economy. (Tr. 16-25.) The Appeals Council denied McCormick's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-12, 206-30.)

McCormick filed a complaint with this Court on September 16, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In his appeal, McCormick argues that the ALJ improperly evaluated his educational level and the opinion of Dr. H.M. Bacchus, a consulting physician who examined him at the request of the Social Security Administration ("SSA"). (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 10-14.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of his date last insured, McCormick was fifty-three years old (Tr. 23), failed to complete the ninth grade, attending special education classes throughout most of his schooling (Tr. 41-42), and possessed work experience as a dishwasher and maintenance mechanic (Tr. 23, 43-45). McCormick alleges that he became disabled as of July, 13, 2003, as amended, due to knee problems, shoulder problems post-surgery in both shoulders, low back and cervical pain, and no depth perception with loss of vision in his right eye. (Opening Br. 2.)

### B. McCormick's Testimony at the Hearing

At the hearing, McCormick testified that he was enrolled in special education classes in school and had severe problems reading and spelling. (Tr. 41.) He reported dropping out of

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 539-page administrative record necessary to the decision.

school in the ninth grade.  (Tr. 42.)  As for his current abilities to read and write, McCormick stated that he did not read the newspaper, but could scan the advertisements and pick out specific things he was looking for, such as a "Ford S-150" truck.  (Tr. 41-42.)  He indicated that he could write simple, short messages, like "I'm going to the tool room," but would have trouble writing longer messages, such as stating why he was going to the tool room.  (Tr. 48.)  He was able to obtain a commercial driver's license by reading and memorizing the necessary sections of the driver's manual.  (Tr. 49.)  McCormick further elaborated that, when he took the written licensing test, he skipped words he did not know until he was able to make sense of the questions.  (Tr. 49.)  He represented that his wife helped him fill out his social security forms and that he had trouble with quite a few words, but might be able to recognize certain words because he has seen them before.  (Tr. 50.)  McCormick further admitted that he could write simple words, such as "go, stop, blue, black, brown, green, [and] keep," but that there were "a lot of" simple words he could not spell.  (Tr. 50.)

McCormick further testified that, in his past work as a maintenance mechanic, he used pre-printed inventory forms that listed each tool by its name and number.  (Tr. 47.)  He indicated that if he came across a tool that was not listed on the sheet and could recall how to spell it, he would write it in.  (Tr. 47.)  On the other hand, if McCormick did not recognize the tool, he would take it to his foreman, who would tell him what it was and write the name in.  (Tr. 47-48.)

## C. Other Witness Testimony

McCormick's wife also testified at the hearing.  (Tr. 63-68.)  She stated that sometimes she cannot make out what McCormick is saying in his notes, but can decipher "pretty much" what he means from his previous notes.  (Tr. 64.)  According to her, McCormick recognizes

what he writes in his own notes "most of the time," stumping himself a couple of times, and, though he writes short notes, he often mixes words up or misspells simple words.  (Tr. 65-66.) She reads McCormick's mail for him because he oftentimes misunderstands what is written.  (Tr. 64.)  But she also indicated that McCormick can write a grocery list.  (Tr. 65.)

### D.  The Vocational Expert's Testimony

An impartial VE testified at the hearing as well.  (Tr. 68-80.)  The ALJ posited to the VE a hypothetical individual who requires opportunities to sit or stand while working; cannot stand and walk more than seventy-five percent of an eight-hour workday; cannot reach extreme postures, stoop, kneel, or bend more often than occasionally; cannot successfully engage in working demanding constant manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with the hands or fingers; cannot work in atmospheric conditions of dust, smoke, and chemical fumes, or temperature and humidity extremes; cannot lift and carry more than twenty pounds occasionally and ten pounds frequently; and lacks ordinary depth perception.  (Tr. 68-70, 72.)  The VE responded that such an individual could perform work as a cleaner, cashier, and stock clerk.  (Tr. 70-72.)

The VE further testified that an inability to read at the sixth grade level would exclude the stock clerk and cashier positions, but would not affect the cleaning job.  (Tr. 72.)  Yet the VE concluded that an individual with the above limitations, including the inability to read at the sixth grade level, could also perform the light, unskilled jobs of packager and laundry worker. (Tr. 73.)  Upon questioning from McCormick's attorney, the VE concluded that a limitation to standing for only four hours out of an eight-hour workday—combined with a sixth grade reading level and monovision—would eliminate any light, unskilled jobs.  (Tr. 74-78.)  The VE also

stated that an individual with a second grade reading and writing level could not satisfactorily

perform inventory as a general matter regarding unskilled work.  (Tr. 79.)

### E.  Evidence Regarding McCormick's Educational Level

According to records from Fort Wayne Community Schools, McCormick was enrolled in

special education classes (Tr. 232) and, when he was fourteen and fifteen years old, scored at the

third grade level in reading and the fourth and fifth grade levels in arithmetic on two

achievement tests (Tr. 231).

In 2002, during a vocational rehabilitation evaluation (*see* Tr.191-98), P.J. Stice, a

certified rehabilitation counselor, administered to McCormick the Wide Range Achievement

Test 3 ("WRAT3"), which provides grade equivalent scoring in reading, spelling, and arithmetic

(Tr. 194).  McCormick scored at the second grade level in reading and spelling and the sixth

grade level in arithmetic.  (Tr. 194.)  While Mr. Stice noted that McCormick's vocational

barriers included low academic scores and a special education background, he still recommended

McCormick for job placement.  (Tr. 196-97.)

In his December 2006 Disability Report, McCormick indicated that he could read and

understand English and write more than his name in English.  (Tr. 147.)  The state agency

employee who interviewed McCormick for his disability application noted no problems with his

reading or writing.  (Tr. 145.)

### F.  Evidence of McCormick's Physical Impairments Relevant to the Decision

In January 2007, Dr. H.M. Bacchus examined McCormick at the request of the SSA.  (Tr.

339-42.)  After gathering McCormick's medical history and performing an evaluation, Dr.

Bacchus concluded that McCormick appeared to have limitations repetitively pushing, pulling,

reaching, and lifting; should avoid working with heavy equipment or in unprotected heights due to his vision loss; appeared to have the functional capacity to stand four hours in an eight-hour workday, noncontinuously; and could lift five to eight pounds frequently and up to twenty to twenty-five pounds occasionally.  (Tr. 340.)  Dr. Bacchus indicated that he had no medical reports available for his review.  (Tr. 340.)

Three months later, in March 2007, Dr. B. Whitley, a non-examining state agency physician, found that McCormick could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for about six hours in an eight-hour workday; could push and/or pull unlimited; and could frequently balance and stoop, occasionally climb ramps and stairs, kneel, crouch, and crawl, and never climb ladders, rope, and scaffolds.  (Tr. 347-48.)  As regards the consultative exam, Dr. Whitley concluded that Dr. Bacchus's restrictions were not supported by other medical evidence in the file.  (Tr. 352.)  A second state agency physician later affirmed Dr. Whitley's opinion.  (Tr. 357.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869

6

(7th Cir. 2000).  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

7

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3]  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

## B.  The ALJ's Decision

On December 7, 2009, the ALJ rendered his decision.  (Tr. 16-25.)  At step one of the analysis, the ALJ found that McCormick had not engaged in substantial gainful activity since his amended alleged onset date through his date last insured.  (Tr. 18.)  The ALJ then concluded at step two that McCormick suffered from severe impairments.  (Tr. 18.)  At step three, the ALJ determined that McCormick's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 18.)  Before proceeding to step four, the ALJ determined that McCormick's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the following RFC:

> The claimant's severe impairments result in a person who, through the date last insured, had the residual functional capacity to perform light work . . . except this person would require opportunities to sit or stand while working.  Relevant impairments would prevent this person from standing and walking longer than 75% of the 8 hour work-day.  This person cannot reach extreme postures (stooping,

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

kneeling, bending, etc.) more often than occasionally. The claimant can read at less than the 6th grade level and do only simple reading. This person cannot successfully engage in work demanding constant manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with hands or fingers. This person cannot work in atmospheric concentrations of dust, smoke, and chemical fumes, or temperature and humidity extremes that would not be as comfortable as ordinary retail, commercial environments. The claimant has monocular vision. This person can lift and carry 20 pounds occasionally and 10 pounds frequently.

(Tr. 20-21.)

Moving onto step four, the ALJ found that McCormick was unable to perform any past relevant work. (Tr. 23.) At step five, however, the ALJ concluded that McCormick could have performed a significant number of light, unskilled jobs within the economy, including cleaning worker, packager, and laundry worker. (Tr. 23-24.) Therefore, McCormick's claim for DIB was denied. (Tr. 25.)

### C. The ALJ's Conclusion That McCormick Was Not "Illiterate" Is Supported by Substantial Evidence

When articulating his step-five determination, the ALJ found that McCormick had an education that was "limited or less." (Tr. 23.) The ALJ further determined that McCormick was not illiterate because he was educated in Fort Wayne Community Schools until the ninth grade; testified that he could write short notes, find some information in a newspaper's want ads, use a simple chart to record inventory, and recognize and spell simple words; and that, while sometimes he needed help with his lists or messages, he was able to leave such messages and was understood. (Tr. 25.) McCormick alleges that in reaching this conclusion the ALJ ignored evidence unfavorable to his finding—specifically, that McCormick was enrolled in special education classes at school (Tr. 232), that achievement testing placed him in the second-to-third grade level in reading and the fourth-to-sixth grade level in arithmetic (*see* Tr. 194, 231), and

testimony not cited by the ALJ that showed his diminished abilities to read and write (*see* Tr. 42, 47-48, 64, 66). McCormick contends that the ALJ's omission is material because if he were found to be illiterate, since he was also closely approaching advanced age and had unskilled past work experience, he would be deemed disabled under grid rule 202.09.[4] *See Skinner v. Sec'y of Health & Human Servs*., 902 F.2d 447, 450 (6th Cir. 1990) (concluding that a claimant who read below the third grade level was illiterate). McCormick's argument, however, essentially amounts to a plea to this Court to re-weigh the evidence with the hope that it will come out in his favor this time. Of course, a plea to the Court to re-weigh evidence is ultimately unavailing. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by re-weighing evidence).

In evaluating a claimant's educational level, the SSA uses the following categories:

(1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

(2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

---

[4] Under grid rule 202.09, an individual closely approaching advanced age who is illiterate or unable to communicate in English and has an unskilled or no past work experience is disabled if he is limited to light work. 20 C.F.R. Part 404, Subpart P, App. 2, Rule 202.09.

The Commissioner notes that even if McCormick's grade level is more accurately represented as second or third grade in reading and fourth or fifth grade in math, the regulations consider this to be marginally educated, not illiterate (Def.'s Mem. in Supp. of Comm'r's Decision 5), and there is support for such an argument, *see Stewart v. Chater*, No. 95C1065, 1996 WL 153883, at *8 (N.D. Ill. Apr. 1, 1996) (noting that a reading ability "below the third grade level" falls in the marginal education category); 20 C.F.R. § 404.1564(b)(2) (generally considering formal schooling at a 6th grade level or less to be a marginal education). Any distinction between marginal education and limited education would be of no moment, as a finding of marginal education would not affect the outcome of this case, and McCormick does not dispute this. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case").

(3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

(4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. § 404.1564(b)(1)-(4). It also emphasizes that the numerical grade level that the claimant completed in school may not represent his actual educational abilities—these may be higher or lower. 20 C.F.R. § 404.1564(b); *see Cole v. Apfel*, No. 98 C 6735, 2000 WL 290432, at *3 (N.D. Ill. Mar. 17, 2000) (noting that "the fact and amount of formal schooling does not decisively foreclose a finding of illiteracy"). However, if there is no other evidence to contradict the numerical grade level, an ALJ will use it to determine a claimant's educational abilities. 20 C.F.R. § 404.1564(b); *see Skinner*, 902 F.2d at 450. The Seventh Circuit Court of Appeals has further found the standard for literacy in this context to be "quite low" and has framed the question as, essentially, "whether the applicant is so deficient in ability to read and write that he cannot obtain even an unskilled job." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).

Here, the record contains evidence of both McCormick's literacy and illiteracy, leading reasonable minds to disagree about whether McCormick was either illiterate or had a limited or less education. *Truckey v. Astrue*, No. 2:10 cv 447, 2011 WL 5101883, at *7 (N.D. Ind. Oct. 27, 2011). On the one hand, suggesting that McCormick may be illiterate, he was enrolled in special education classes in school; could not read the newspaper; had trouble writing messages longer than "I'm going to the tool room"; had help from his wife filling out his social security forms;

and testified that he had trouble with quite a few words and that there were "a lot of" simple words he could not spell.  (Tr. 41, 48-50.)  McCormick's wife also stated that sometimes she could not make out what McCormick was saying in his notes and she could only decipher them because she was familiar with his writing; that a couple of times McCormick could not make out what he had written; and that she reads McCormick's mail for him.  (Tr. 64-66.)  Moreover, achievement testing from McCormick's teenage years placed him at the third grade level in reading and the fourth and fifth grade levels in arithmetic.  (Tr. 231.)  Similarly, on WRAT3 testing in 2002, McCormick scored at the second grade level in reading and spelling and the sixth grade level in arithmetic.  (Tr. 194.)

On the other hand—and supporting a literacy finding—McCormick was educated until the ninth grade, when he dropped out; could scan newspaper advertisements and pick out specific things he was looking for; could write simple, short messages; obtained a commercial driver's license by reading and memorizing the necessary sections of the driver's manual; took the written licensing test, skipping words he did not know until he could make sense of the questions; and could write simple words like "go," "stop," "blue," "black," "brown," "green," and "keep."  (Tr. 41-42, 48-50.)  Additionally, in his prior job as a maintenance mechanic, McCormick used pre-printed inventory forms that listed each tool by its name and number and could write in some tools not listed on the form if he recalled how to spell them; otherwise, the foreman helped him.  (Tr. 47-48.)  McCormick's wife testified that McCormick recognizes what he writes in his own notes "most of the time," verified that he writes short notes, and indicated that he can write a grocery list.  (Tr. 64-66.)  She further stated that sometimes she cannot make out what McCormick is saying in his notes, implying that other times she can understand them.

(Tr. 64.)  Furthermore, the state agency employee who interviewed McCormick for his disability application noted no problems with his reading or writing.  (Tr. 145.)  And McCormick indicated in his Disability Report that he could read and understand English and could write more than just his name in English.  (Tr. 147.)  Finally, despite low test scores placing McCormick at the second grade level in reading and spelling, the certified rehabilitation counselor still recommended McCormick for job placement in 2002.  (Tr. 196-97.)

Faced with such evidence, the ALJ had to make a decision regarding McCormick's literacy.  And "[w]hen reasonable minds can disagree as to the ALJ's conclusion, as is the case here, the ALJ's decision should be affirmed unless the reasoning is 'so poorly articulated as to prevent meaningful review.'"  *Truckey*, 2011 WL 5101883, at *7 (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).  Importantly, this is not a case in which the ALJ failed to elaborate on his conclusion regarding the claimant's literacy, which would necessitate a remand.  *Id.* (remanding where the record contained evidence of both illiteracy and literacy but the ALJ merely concluded that the claimant had a limited education without any explanation); *Schimpf v. Astrue*, 780 F. Supp. 2d 798, 802-03 (S.D. Ind. 2011) (remanding because the ALJ failed to articulate any reason why the claimant fell into the limited education category rather than the illiterate category).  Rather, "[b]ased on the record, the gap between concluding [McCormick] was illiterate or that he had a limited [or less] education required a logical bridge to traverse," *Truckey*, 2011 WL 5101883, at *7, and the ALJ here provided such a bridge.

While the ALJ did rely on the fact that McCormick was educated in Fort Wayne Community Schools until the ninth grade in finding him literate, in the face of contradictory evidence, he did not simply end his analysis there.  *See Skinner*, 902 F.2d at 450 ("A numerical

13

grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist."); 20 C.F.R. § 404.1564(b).  Once McCormick raised the issue of his potential illiteracy, "[t]he ALJ had an obligation to develop a complete record," *Yourek v. Barnhart*, 334 F. Supp. 2d 1090, 1093 (N.D. Ill. 2004), and the ALJ fulfilled that obligation. When McCormick told the ALJ that he did not read the newspaper, the ALJ inquired into whether McCormick could pick out certain words in the want ads, such as a "Ford S-150"; McCormick stated that he could find this ad if he knew specifically what he was looking for, which supports a finding of literacy.  *See Starks v. Bowen*, 873 F.2d 187, 190 (8th Cir. 1989) (upholding literacy finding when claimant knew "some" but not a lot of words in newspaper articles); *Glenn*, 814 F.2d at 390 (affirming literacy finding when claimant could not read the newspaper but could pick out some words in it).  At the hearing, the inquiry went even further, with McCormick stating he could spell simple words such as "go," "stop," "blue," "black," "brown," "green," and "keep," further strengthening the ALJ's literacy determination.  *Cole*, 2000 WL 290432, at *4 (emphasizing that in order to make a meaningful determination of literacy, it would have been helpful if the ALJ knew what specific words the claimant could read or if the claimant had demonstrated his reading/writing ability to the ALJ).

The ALJ further noted that McCormick could write short notes and use a simple chart to record inventory, although he sometimes needed help in these tasks.  (Tr. 25.)  Therefore, this is not a case in which the ALJ ignored contradictory evidence regarding McCormick's numerical grade level—there is no dispute that McCormick dropped out of school in the ninth grade—and relied merely on that grade level to find he was literate.  *See Skinner*, 902 F.2d at 450 (finding error when the ALJ relied merely upon the claimant's numerical grade level, which was

14

contradicted, and did not consider test scores placing him below the third grade level in reading

and at the third grade level in math or opinions from both a certified rehabilitation counselor and

vocational expert that found him functionally illiterate).  Furthermore, unlike in *Skinner*, here,

the certified rehabilitation counselor that administered the WRAT3 to McCormick recommended

job placement despite his second grade reading and spelling scores and did not find him

functionally illiterate.  The ALJ's failure to specifically mention that McCormick took special

education classes, had low test scores, or testimony qualifying his reading and writing abilities[5]

does not detract from what the ALJ *did* do.  And the Court will not entertain nitpicking of the

ALJ's well-reasoned opinion.  *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004)

(explaining that when reviewing the ALJ's decision, the court will "give the opinion a

commonsensical reading rather than nitpicking at it").

Considering the regulation's definition of illiteracy—a person is illiterate if he or she

"cannot read or write a simple message such as instructions or inventory lists even though the

person can sign his or her name," 20 C.F.R. § 404.1564(b)—rather than relying merely on

McCormick's numerical grade level, the ALJ considered what McCormick could functionally

do.  The essential question is "whether [McCormick] is so deficient in ability to read and write

---

[5] Specifically, McCormick argues that the ALJ failed to evaluate his testimony that he could properly write only *parts* of short, simple messages; could not read the newspaper; could only identify the models of vehicles such as "Ford S-150"; and sometimes needed the foreman's help to complete his inventory when he was a maintenance mechanic as well as his wife's testimony that she could read many of his messages only because she was familiar with his spelling and handwriting, could not make out some of his messages, and completed McCormick's social security forms for him; and that McCormick misunderstood his mail when he read it, sometimes did not recognize what he wrote himself, and often misspelled simple words.  (Opening Br. 12.)  Although the ALJ did not specifically mention all of this testimony, he did note that McCormick had an "idiosyncratic approach to language and spelling, as his wife confirmed," (Tr. 19) and that he sometimes required help with his lists and messages (Tr. 19, 25), suggesting that he had considered this testimony qualifying McCormick's reading and writing abilities even if he did not explicitly mention it.  Regardless, it is not this Court's place to re-weigh the evidence. *Brindisi*, 315 F.3d at 785.

that he cannot obtain even an unskilled job," *Glenn*, 814 F.2d at 391, and not what he scored on achievement tests, *see Stewart*, 1996 WL 153883, at *8 (noting that "while [the claimant's] reading scores on the WRAT-R may have placed him in that test's functionally illiterate classification, that does not mean he is illiterate within the meaning of the Social Security regulations").  While McCormick sometimes needed help, he conceded that he could write short notes, pick out specific information in newspaper advertisements, and recognize and spell some simple words.  Moreover, in his past job as a maintenance mechanic, he successfully used a simple chart to record inventory—albeit sometimes with assistance.  Taken together, there was substantial evidence supporting the ALJ's conclusion that McCormick had a "limited or less" education and thus was not illiterate.[6]  *See Glenn*, 814 F.2d at 391 (affirming literacy finding when the claimant had either a fourth or sixth grade education, could compose and write "only the simplest messages," and could "comprehend only the simplest written instructions"); *see also Howard v. Massanari*, 255 F.3d 577, 585 (8th Cir. 2001) ("The administrative record contains evidence pointing to [the claimant's] ability to read, and, given our deferential standard of review, we deem the evidence sufficient to support the ALJ's conclusion that [the claimant] is functionally literate." (internal citation omitted)).

　　　　Furthermore, that reasonable minds may disagree with the ALJ's conclusion does not

---

[6] And the record contains other evidence not specifically relied upon by the ALJ suggesting McCormick's literacy, such as his ability to obtain a commercial driver's license by *reading* and memorizing the necessary sections of the driver's manual, (Tr. 49); *see Howard*, 255 F.3d at 585 (noting, in support of the claimant's literacy, that she passed a driver's test, which would require a written exam, and the lack of evidence that it was read to her or that she otherwise passed it without reading the questions on her own), his affirmative answers to questions asking if he can read and understand English and write more than his name in English in the Disability Report, (Tr. 147); *see Hazelwood v. Astrue*, No. 1:11-CV-00103, 2012 WL 1301234, at *4 (N.D. Ind. Apr. 16, 2012) (finding that the claimant's indication in his disability report that he could read and understand English and write more than just his name supported the ALJ's literacy conclusion), and the disability interviewer's representation that McCormick had no problems reading or writing, (Tr. 145); *see id.*

16

warrant a remand because "the ALJ's decision should be affirmed unless the reasoning is 'so poorly articulated as to prevent meaningful review.'" *Truckey*, 2011 WL 5101883, at *7 (quoting *Steele*, 290 F.3d at 940). The Seventh Circuit has "repeatedly stated that the ALJ need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *accord Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). Considering the ALJ's inquiry into McCormick's functional ability to read and write, his failure to mention that McCormick was in special education, had low testing scores, and testimony qualifying his reading and writing abilities falls short of "an entire line of evidence" that would constitute a failure-to-articulate error by the ALJ and necessitate a remand of the Commissioner's final decision. *See Carlson*, 999 F.2d at 181 ("If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required."). And, once again, this Court cannot re-weigh the evidence. *Brindisi*, 315 F.3d at 785. As explained above, the ALJ adequately articulated his reasoning and created a logical bridge to his conclusion, permitting this Court to conduct a meaningful review and avoiding a remand.

Not to be deterred, McCormick argues that the ALJ failed to mention the VE's testimony that an individual who had a second grade reading and writing ability could not perform inventory satisfactorily, testimony which he claims is important because the regulation indicates that an inability to read or write inventory lists is an example of illiteracy. (Opening Br. 12-13.) The Court will not nitpick the ALJ's decision. *See Rice*, 384 F.3d at 369. Under the regulations, an individual is illiterate if he "cannot read or write a simple message instructions or inventory lists." 20 C.F.R. § 404.1564(b). Regardless of what a hypothetical person with second grade reading and writing abilities could do, the ALJ conducted a thorough inquiry into and analysis of

17

*McCormick's* ability to read and write, which included successfully completing inventory forms in the past, albeit with assistance.  And the record contains evidence that McCormick could write short notes, find some information in the newspaper's advertisements, use a simple chart to record inventory, and recognize and spell simple words, thus supporting the ALJ's determination that McCormick was not illiterate.

In sum, McCormick's assertion of illiteracy is unpersuasive; the ALJ's finding that he was not illiterate is amply supported by the evidence of record.  Therefore, the Commissioner's final decision will be affirmed.  *See generally Glenn*, 814 F.2d at 391 ("The question, to repeat, is not whether we . . . would call [the claimant] literate but whether he fits the definition in the regulations.  That depends on whether he can read well enough—though very poorly—to perform a job requiring few skills.  The administrative law judge thought that he could, and . . . we cannot say that his determination was unsupported.").

### D.  The ALJ's Consideration of Dr. Bacchus's Opinion Does Not Contain Legal Error

McCormick also argues that the ALJ failed to properly evaluate the opinion of Dr. Bacchus, who performed his consultative exam.  (Opening Br. 13-14.)  Specifically, McCormick alleges that the ALJ committed error by either not evaluating, or failing to include in his hypothetical, Dr. Bacchus's opinion that McCormick could stand for four hours in an eight-hour workday.  (Opening Br. 13.)  When evaluating Dr. Bacchus's opinion, the ALJ gave "significant weight" to his opinions that McCormick was limited—as the ALJ interpreted it—to roughly the light exertional level and that he must not continuously stand, but did not mention Dr. Bacchus's opinion that McCormick "appears to retain the functional capacity to stand for 4 hours in an 8 hour day."  (Tr. 340; *see* Tr 22.)  The ALJ then opined that Dr. Bacchus's evaluation was

18

"lacking other details of importance."  (Tr. 22.)

　　　　Immediately preceding the ALJ's consideration of Dr. Bacchus's opinion, the ALJ considered the opinions of the non-examining state agency physicians, noting that the opinion of the medical consultant—Dr. Whitley—agreed for the most part with the assigned RFC (Tr. 22), which limited McCormick to standing and walking for no longer than seventy-five percent (or six hours) in an eight-hour workday (Tr. 20).  According to the ALJ, the primary differences between his RFC and Dr. Whitley's opinion was McCormick's need to avoid pulmonary irritants and be allowed a sit/stand option as well as the ALJ's finding that he has only one useful eye.  (Tr. 22.)  Ultimately, the ALJ concluded that Dr. Whitley's opinion was given significant weight as to the claimant's ability to lift and carry, but not given significant weight as to environmental, visual, and sit/stand restrictions.  Yet McCormick interprets this as the ALJ not giving significant weight to the opinions of the state agency physicians that he could stand and/or walk for six hours out of an eight-hour workday.  (*See* Opening Br. 13.)  Upon further evaluation of the ALJ's opinion, however, it is appears as though his statement that he was not giving significant weight to Dr. Whitley's "sit/stand restrictions" refers to McCormick's need to be allowed a sit/stand option, which the ALJ explicitly noted was one of the primary differences between his RFC and Dr. Whitley's opinion.  (Tr. 22.)  Therefore, although the ALJ did not explicitly mention Dr. Whitley's standing and walking restriction, he incorporated it into his RFC.  (*See* Tr. 20 ("Relevant impairments would prevent this person from standing and walking longer than 75% of the 8 hour work-day.").)

　　　　While the Commissioner must "evaluate every medical opinion [it] receive[s]," 20 C.F.R. § 404.1527(c), the ALJ need not discuss or make a written evaluation of every piece of evidence,

*McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  At the same time, an ALJ may not select and discuss only that evidence which favors his ultimate conclusion or ignore an entire line of evidence that is contrary to the ruling.  *Golembiewski*, 322 F.3d at 917; *Herron*, 19 F.3d at 333; *Anderson v. Astrue*, No. 1:10-cv-00587-SEB-MJD, 2011 WL 3739257, at *4 (S.D. Ind. Aug. 23, 2011).  Although the regulations do not require the ALJ to explicitly mention every doctor's name and every detail in his report, "when there is reason to believe that an ALJ ignored important evidence—as when an ALJ fails to discuss material, conflicting evidence—error exists." *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011) (unpublished); *see McKinzey*, 641 F.3d at 891 (finding error when ALJ failed to consider opinion of state agency physician).  Ultimately, the ALJ must review the record fairly and must articulate, at least at some minimal level, his analysis of the evidence to allow this Court to trace the path of his reasoning and to be assured that he considered the important evidence.  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *see Herron*, 19 F.3d at 333.

Pursuant to the agency's regulations and rules, the ALJ is required to consider a consultative examiner's opinion and explain the weight given to such an opinion in his decision. *Walters*, 444 F. App'x at 917; *McKinzey*, 641 F.3d at 891; *Lucio v. Barnhart*, No. 03 C 7078, 2004 WL 1433637, at *12 (N.D. Ill. June 22, 2004); *see* 20 C.F.R. § 404.1527(f)(2)(i); 20 C.F.R. § 404.1527(f)(2)(ii).  Here, the ALJ did not completely fail to mention or address Dr. Bacchus's opinion in its entirety, which could necessitate a remand.  *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (stating that the ALJ's failure to discuss a physician's report "in its entirety prevents this court from tracking the ALJ's reasons for discounting it"); *Lucio*, 2004 WL

20

1433637, at *11 (stating that the ALJ erred in failing to address or even mention a consultative examiner's opinion about the claimant's significant physical limitations).  Rather, he mentioned Dr. Bacchus's opinion several times.  (*See* Tr. 19-20 (discussing Dr. Bacchus's opinion regarding McCormick's lifting and carrying restrictions), 21 (noting Dr. Bacchus's consultative examination in reference to the assigned RFC), 22 (assigning weight to Dr. Bacchus's opinion regarding McCormick's limitation to roughly light exertional work and his inability to continuously stand).)

Moreover, in explaining the assigned RFC, the ALJ noted that the relevant medical evidence included the treating physicians' chart notes and the evaluation by the physician who performed the consultative examination—Dr. Bacchus—and that "[t]hese establish, at most, that the claimant could not sit continuously or stand/walk continuously in an 8-hour workday."  (Tr. 21.)  Therefore, while the ALJ does not explicitly mention Dr. Bacchus's opinion that McCormick could stand for only *four hours* in an eight-hour day, noncontinuously, he *does* mention and include in his RFC that McCormick could not, "at the most," stand/walk continuously in an eight-hour workday, implicitly rejecting his opinion that McCormick could only stand for four hours.[7]  The ALJ's statement that these were "at most" the restrictions that Dr. Bacchus's opinion, along with the chart notes of McCormick's treating physicians, established suggests that the ALJ was aware of Dr. Bacchus's more restrictive limitation—that he believed McCormick could only stand for four hours—but that he rejected it instead of simply ignoring it.

But the ALJ does not simply create for himself the RFC restriction limiting McCormick

_____

[7] Notably, Dr. Bacchus says *nothing* about McCormick's ability to stand *and walk* in an eight-hour workday, which was the specific restriction included in the ALJ's RFC.

to standing and walking no longer than seventy-five percent of the eight-hour workday, which would constitute error, *see, e.g.*, *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (determining that the ALJ played doctor when he constructed his own RFC by rejecting a physician's findings without explaining his reasons for doing so); he implicitly adopts Dr. Whitley's findings on this point (*see* Tr. 347 (opining that McCormick could stand and/or walk for a total of about six hours in an eight-hour workday)).  Rather, in reviewing the opinions of the non-examining state agency physicians, the ALJ notes that the opinion of the medical consultant—Dr. Whitley—agrees for the most part with the assigned RFC.  (Tr. 22.)  The ALJ then continues on to note the specific differences between Dr. Whitley's opinion and the RFC—namely, the claimant's need to avoid pulmonary irritants and be allowed a sit/stand option and that he has only one useful eye.  (Tr. 22.)  He does not mention McCormick's ability to stand and/or walk as a difference and, therefore, implicitly adopts Dr. Whitley's finding on this issue.[8]

Additionally, although the ALJ did not incorporate Dr. Bacchus's opinion as to the length of time McCormick could stand into his RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Moreover, while the ALJ may decide to adopt all of the opinions expressed in a medical source statement, a medical

---

[8] Moreover, Dr. Whitley, whose standing and walking restrictions the ALJ implicitly adopted, found that the restrictions given at Dr. Bacchus's consultative examination were not supported by other medical evidence in the file.  (Tr. 352.)  Indeed, in giving his opinion as to McCormick's limitations, Dr. Bacchus notes that he "had no medical reports available for [his] review today."  (Tr. 340.)

And it is unclear whether Dr. Bacchus was opining as to only McCormick's ability to *stand* and not his ability to *stand and walk* in combination.  If Dr. Bacchus was opining as to only McCormick's ability to stand, rather than stand and/or walk, Dr. Bacchus's opinion does not necessarily conflict with that of the state agency physicians, who concluded that McCormick could stand *and/or walk* for about six hours in an eight-hour workday. Conceivably, in an eight-hour workday, McCormick could stand for a total of four hours, noncontinuously, and walk for a total of two hours, noncontinuously, for a total of six hours standing and/or walking, which would be consistent with both Dr. Bacchus's opinion and that of the state agency physicians.

source statement must not be equated with the ALJ's assigned RFC, SSR 96-5p, "which is a legal decision rather than a medical one," *Lane v. Astrue*, No. 1:10-CV-28 JD, 2011 WL 3348095, at *11 (N.D. Ind. Aug. 3, 2011).  Rather, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence—which, in this case, would include the opinions of both the examining and non-examining state agency physicians—as well as the claimant's own statement about what he is able or unable to do.  *Diaz*, 55 F.3d at 306 n.2.  In the end, "[t]he ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one," *Lane*, 2011 WL 3348095, at *11; *see* 20 C.F.R. § 404.1546(c), and is responsible for resolving conflicting medical evidence, *Diaz*, 55 F.3d at 306 n.2; the ALJ fulfilled both of those responsibilities here.

Next, McCormick asserts that the ALJ committed legal error at step three by not explicitly addressing the checklist of factors under 20 CFR § 404.1527(c) in considering Dr. Bacchus's opinion.  (Opening Br. 13; Reply Br. 4.)  Unless a treating source's opinion is given controlling weight, the ALJ must consider the following six factors when determining the weight given to any medical opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  20 C.F.R. § 404.1527(c).  "It is true that the regulation requires the ALJ to consider those six factors, but his decision need only include 'good reasons' for the weight given to the [medical] source's opinion rather than 'an exhaustive factor-by-factor analysis.'"  *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis*

*v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. Mar. 2011) (unpublished)) (dealing with a treating source's opinion); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no "*articulation* requirement for each and every factor" and that "ALJs are not required to produce prolix opinions containing checklists from all of the regulations" (emphasis in original)).

Moreover, "[n]ot every factor for weighing opinion evidence will apply in every case." SSR 06-03p. "Rather, the ALJ must sufficiently articulate [his] assessment of the evidence to assure the court that [he] considered the important evidence and to enable the court to trace the path of [his] reasoning." *Brown*, 298 F. Supp. 2d at 792. Therefore, it is enough if the ALJ generally covers the ground of 20 C.F.R. § 404.1527(c) and provides "good reasons" for the weight assigned to the physician's opinion. *See Hanson*, 2011 WL 1356946, at *12; *accord Oldham*, 509 F.3d at 1258 (noting that the ALJ provided good reasons for the weight he gave to the treating sources' opinion and concluding that "[n]othing more was required in this case").

Here, while the ALJ does not explicitly apply every checklist factor to Dr. Bacchus's opinion, he does consider a number of them throughout his decision. For instance, the ALJ discusses "*the evaluation* by the physician who performed the consultative *examination*" (Tr. 21 (emphasis added)), implicitly addressing the length of the treatment relationship and frequency of examination—which, by the use of singular nouns, was a single examination—and the nature and extent of the treatment relationship—that Dr. Bacchus actually examined McCormick. Elsewhere in the opinion, the ALJ considered the evidence supporting Dr. Bacchus's various

24

opinions, including his restrictions on McCormick's lifting and carrying abilities (Tr. 19-20), his

conclusion that McCormick could not stand continuously (Tr. 21), and his limitation of

McCormick to what the ALJ interpreted as "roughly" the light exertional level (Tr. 22), and

assigned significant weight to some of these opinions (Tr. 22).  While the ALJ did not

specifically address Dr. Bacchus's standing restrictions, as explained above, he implicitly

rejected them, adopting Dr. Whitley's opinion instead.  Thus, the ALJ generally covered the

ground of the checklist factors and provided good reasons for the weight he assigned to Dr.

Bacchus's opinion; nothing more is required in this case.  *Oldham*, 509 F.3d at 1258.

Lastly, McCormick argues that the ALJ's failure to mention Dr. Bacchus's standing

restriction is not harmless because, based on the VE's testimony, a limitation to four hours

standing, along with McCormick's other impairments such as a sixth grade reading ability and

monovision, "would eliminate the job relied upon by the ALJ and other jobs at the light level,"

making him disabled under grid rule 201.10.  (Opening Br. 14 (citing Tr. 74-78).)  Yet the ALJ

implicitly rejected this standing limitation in favor of that opined by Dr. Whitley.  He was not

required to specifically address this more restrictive hypothetical merely because it suggested

disability.  *See Spar v. Astrue*, No. 2:07 cv 210, 2009 WL 1044624, at *12 (N.D. Ind. Apr. 17,

2009) (noting that "an ALJ is justified in ignoring a response to a hypothetical if it was based on

limitations and restrictions that the ALJ has justifiably rejected").

While the ALJ could have done a better job of explicitly rejecting Dr. Bacchus's opinion

on McCormick's ability to stand, perfection is not necessary.  *See Fisher v. Bowen*, 869 F.2d

1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to

remand a case in question of a perfect opinion unless there is reason to believe that the remand

25

might lead to a different result."). Instead, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). By mentioning and discussing most of Dr. Bacchus's opinion—and implicitly rejecting his restrictive limitation on McCormick's ability to stand in favor of Dr. Whitley's stand and/or walk restriction—the ALJ has done enough here and his decision is supported by substantial evidence. *See Liskowitz v. Astrue*, 559 F.3d 736, 746 (7th Cir. 2009) (holding that, while it would have been better if the ALJ gave a "better-reasoned basis" for rejecting a treating physician's opinion, the ALJ's decision was nonetheless supported by substantial evidence).

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against McCormick.

SO ORDERED.

Enter for this 23rd day of May, 2012.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge